### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PAULA K. GOSVENER, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | )   CASE No. 08-CV-723-FHM |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| DEFENDANT. | ) |

### OPINION AND ORDER

Plaintiff, Paula K. Gosvener, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1] Plaintiff's March 24, 2005 (Protective Filing date: March 18, 2005) applications for Disability Insurance and Supplemental Security Income benefits were denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held January 25, 2007. By decision dated February 20, 2007, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on October 15, 2008. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003).  The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).  Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 37 years old on the date of the decision. [R. 21, 52].  She claims to have been unable to work since April 15, 2002, due to borderline personality disorder, attention deficit disorder, bipolar disorder, posttraumatic stress disorder and affective disorder. [R. 296].  The ALJ determined that Plaintiff has severe impairments consisting of bipolar disorder and personality disorder. [R. 17].  Despite these impairments, the ALJ found that Plaintiff retains the residual functional capacity (RFC) to perform medium work with moderate limitations in ability to work in coordination with or proximity to others without being distracted by them and to interact appropriately with the general public. [R.18].  Based upon the testimony of a Vocational Expert (VE) he determined that Plaintiff's RFC precluded her past relevant work (PRW) as a nurse's aide but that there are jobs existing in significant numbers in the national economy Plaintiff can perform. [R. 21].  He concluded, therefore, that Plaintiff is not disabled as defined by the Social Security Act. [R. 23].  The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

2

Plaintiff asserts the ALJ improperly rejected the opinion of her treating physician and that he failed to properly evaluate her credibility. [Dkt. 19, p. 6].  For the following reasons, the Court finds this case must be reversed and remanded to the Commissioner for  reconsideration.

## Medical Evidence

The record reveals that Plaintiff has a long-standing history of emotional and mental problems.  Apart from the report and opinions of the agency physicians, the medical evidence is composed entirely of treatment records from Family & Children Services (F&CS) mental health facility where Plaintiff was seen initially on April 30, 2002, two weeks after her claimed disability onset date. [R. 239].  At that time, Plaintiff was noted to have occasional major disruption of daily life due to emotional strife, frequent distortion of thinking due to emotional factors and no problems due to substance abuse. *Id.*

Plaintiff was next seen on March 10, 2003, by Vanessa Werlla, M.D., a psychiatrist at F&CS, and Naomi Beck, B.S., a counselor at F&CS, who described Plaintiff as anxious during the interview. [R. 236-238].  Plaintiff's behavior and appearance was secretive with furtive eye contact and intermittent motor activity, appeared tired, had restricted emotions, average fund of knowledge and fair abstraction, judgment and insight.  Seroquil and Celexa were discontinued at Plaintiff's request and her dosage of Lithium was to be managed by her "significant other" because of Plaintiff's history of over-dose.

Besides being seen regularly by Dr. Werlla, Plaintiff's treatment plan included weekly telephone contacts and scheduled counseling sessions with case managers and

3

nurses at F&CS.   Between March 2003 and December 2004, Plaintiff was reported variously as:  "doing well" and enrolling in a legal assistant program; to having episodes of cutting her arms, eating in her sleep, having conflicts with co-students, smoking pot, being depressed and anxious, demonstrating poor abstraction, judgment, insight and attitude; to having a brighter affect, eating less, distancing herself from drug-abusing friends, continuing legal studies; to appearing at the crisis center feeling suicidal and overwhelmed with school and life; to reporting she felt no response to treatment; to being totally dependent on her room-mate; to desiring a job and doing well on medication. [R. 152-238].  During the 21 months that Plaintiff was under the care of Dr. Werlla and her treatment team at F&CS, Plaintiff missed appointments or was unavailable for telephone contacts 26 times.

On December 16, 2004, Plaintiff's treatment was transferred to the North F&CS location because Plaintiff was living in Skiatook. [R. 151, 154].

Plaintiff was seen by Stephanie Drummond, D.O., at the North FC&S on January 27, 2005. [R. 151].  Dr. Drummond's notes reflect Plaintiff was separated from her husband since 2001, now living with another woman in a lesbian relationship and had a history of bipolar disorder but "pt feels she is not." *Id.*  Plaintiff reported an increase in irritability and excessive spending and claimed her last substance abuse was two years ago and her last episode of self mutilation was one year ago. *Id.*  Her mood was depressed and she was hyperverbal. Dr. Drummond discontinued Prozac and commenced a trial of Lamictal. *Id.*

During the following 18 months of treatment by Dr. Drummond and the counseling staff at F&CS, Plaintiff missed five appointments. [R. 127-151, 242-271].

Notations by Dr. Drummond, case managers and counselors described Plaintiff alternately as: having difficulty focusing, concentrating and coping, anxious and depressed, preoccupied with thoughts of death, heaven and hell, staying home, cleaning house as a means of relieving stress, caring for animals, increased irritability and excessive spending, anxiety while driving, up-and-down emotions, decreased self worth; to having neat appearance, good eye contact, good mood, broad affect, normal speech, being well engaged in session, intact thought processes; to feeling lonely, waking frequently, screaming, kicking and crying during sleep, having flashbacks of physical and sexual abuse; to reporting new medications were working well but making her sleepy and having assessed GAF of 48[2]; to being in a depressed mood with flat affect; to being taken to the emergency room for suicidal ideation, anxiety and UTI. [R. 127-151, 242-271].

The record contains a Mental Residual Functional Capacity Assessment signed by Dr. Drummond on August 30, 2005. [R. 284-287].   Dr. Drummond assessed moderate limitations in Plaintiff's ability: to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to interact appropriately with the general public; to maintain socially appropriate behavior and adhere to basic standards of neatness and

---

[2]  A global assessment of functioning score is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning. A GAF score of 41-50 indicates: "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) (DSM-IV-TR); *Langley v. Barnhart*, 373 F.3d 1116, 1122 n. 3 (10th Cir.2004).

cleanliness; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. *Id.* She determined Plaintiff was markedly limited in ability: to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. *Id.* Plaintiff's ability: to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to make simple work-related decisions; to ask simple questions or request assistance; and to be aware of normal hazards and take appropriate precautions was not significantly limited. *Id.*

The last treatment notation in the record from FC&S was written by Larry R. Taylor, M.D., on June 29, 2006. [R. 242].  Dr. Taylor reported Plaintiff had received Ativan when she had a "breakdown" one month ago "which helped" and he approved her request to use it on an as-needed basis to augment her other medications. [R. 242, 270-271].  Borderline Personality Disorder was added to Plaintiff's previous diagnoses of Bipolar I Disorder and PTSD. *Id.* [R. 242].

Minor W. Gordon, Ph.D., a psychologist, saw Plaintiff on behalf of the Social Security Administration on August 10, 2006. [R. 272-283].  Dr. Gordon reported Plaintiff's history and her subjective complaints: "I don't like people, I get anxious and I have a hard time completing projects, I forget what I am supposed to be doing and I

6

don't do well with superiors at all, the last job I had I got into a big fight with a coworker and after that I had a breakdown and I cried for two days, also I am slow and it takes me awhile to catch on to things." [R. 272-273].  He reviewed Plaintiff's medical records and conducted psychological testing, including a mental status examination, Wechsler Memory Scale-III, Beck Depression Inventory, Beck Anxiety Inventory and Minnesota Multiphasic Personality Inventory-II. [R. 273-277].  Dr. Gordon acknowledged Plaintiff's extensive history of inpatient psychiatric treatment including six different admissions to inpatient psychiatric services and her ongoing treatment at F&CS. [R. 277].  He reported, however, that she "missed more appointments than she kept."  He found noteworthy Plaintiff's history of abusing illicit drugs and emphasized that Plaintiff claimed she last abused marijuana two years ago.  He concluded Plaintiff was malingering based upon what he thought was a treatment note signed by Dr. Werlla on April 1, 2006, reporting that Plaintiff had relapsed and abused marijuana over the weekend.  He was unable, he said, to substantiate the diagnosis of bipolar disorder. He found Plaintiff's primary problem "appears to be a borderline personality disorder" and apparent problems with ongoing cannabis abuse if not polysubstance abuse.  He opined Plaintiff likely would have difficulty relating to the general pubic but could relate to coworkers and supervisors for work purposes. *Id.*  Dr. Gordon's diagnoses were: Axis I: 1) Malingering, 2) Cannabis abuse and possibly other illicit drug abuse, ongoing; Axis

II: Borderline personality disorder; Axis III: See review of medical records; Axis IV: Mild impairment; Axis V: GAF 70.[3] [R. 277-278].

### The ALJ's Decision

The ALJ found Plaintiff has severe impairments of bipolar disorder and personality disorder. [R. 17].  After paraphrasing Plaintiff's testimony at the hearing, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. [R. 19].  He said: "Despite alleging that she is disabled and unable to work, the claimant began and completed an Associate degree legal assistant program since her alleged onset date.  Additionally, the claimant was not honest with the examiners regarding her drug use." [R. 19-20].

The ALJ summarized the medical evidence, noting in particular the scheduled appointments at F&CS that were reported as "no shows." [R. 20].  He acknowledged the portion of Charlotte Demarais's March 24, 2006 letter[4] setting forth Plaintiff's diagnoses of bipolar I disorder, most recent episode depressed, severe without psychotic features; and posttraumatic stress disorder. *Id.*  Dr. Gordon's test results and findings were presented in detail by the ALJ in his decision. [R. 20-21].  He noted that Dr. Gordon had been unable to substantiate the diagnosis of bipolar disorder and had opined that Plaintiff appears to have problems with ongoing cannabis abuse if not

---

[3]  A GAF score of 61-70 indicates: Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning( e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV-TR, at 34.

[4]  Ms. Demarais reported F&CS was working with Plaintiff on coping skills for depression, anxiety and flashbacks; that her bipolar symtoms often come unexpected and bring on anxiety and fear, that Plaintiff was receiving medication management and case management services and "due to her symptoms she is unable to work." [R. 127].

polysubstance abuse. *Id.*   The ALJ also acknowledged Dr. Drummond's Mental Residual Functional Capacity Assessment. [R. 20-21].   He then said: "At the hearing, the claimant testified that she only saw Dr. Drummond for a total of about 5 to 10 minutes.   Therefore, weight is not given to that assessment.   Weight is given to Dr. Gordon's opinion, who thoroughly evaluated the claimant." [R. 21].

## Discussion

Plaintiff contends the ALJ improperly rejected Dr. Drummond's opinion. [Dkt. 19, p. 7-8].   After review of the record and the ALJ's written decision, the Court agrees with Plaintiff that the ALJ failed to provide a legitimate reason for rejecting Dr. Drummond's opinion.

The ALJ said "weight is not given" to Dr. Drummond's assessment, indicating that Dr. Drummond's opinion was rejected. [R. 21].   The only reason the ALJ expressly stated for rejecting Dr. Drummond's Mental Source Statement was that Plaintiff had testified she only saw Dr. Drummond "for a total of about 5 to 10 minutes." [R. 21]. Although the ALJ did not say how much weight he assigned to the opinion of the agency consultative physician, Dr. Gordon, the ALJ's assessment of Plaintiff's RFC mirrors that of Dr. Gordon. [R. 18, 280-282].   It appears, therefore, that the ALJ rejected Dr. Drummond's opinion in favor of Dr. Gordon's opinion to assess Plaintiff's ability to perform work-related activities.   The Court examines the record and the ALJ's decision to determine whether the ALJ provided a legally sufficient explanation for doing so.

While it is the ALJ, not a physician, who ultimately determines a claimant's RFC from the evidence in the record,  a treating physician may proffer an opinion about the nature and severity of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2).   The

9

opinion of a physician who has seen a claimant over a period of time for purposes of treatment is generally entitled to more weight than that of an agency physician who examined the claimant only once. *See Doyal*, 331 F.3d at 762  (the treating physician's opinion is given particular weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." (quoting 20 C.F.R. §§ 416.927 (d)(2).).   The opinion of a treating physician may be rejected if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is not consistent with the other substantial evidence in the record. *Id.*  If the treating physician's opinion is rejected completely, the ALJ must give " specific, legitimate reasons " for doing so. *See Miller v. Chater*, 99 F.3d 972, 976 (10th Cir.1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir.1987)).

The ALJ cited Plaintiff's testimony that she saw Dr. Drummond only 5 to 10 minutes, presumably to discredit the physician's opinion on the basis of not being supported by medically acceptable clinical diagnostic techniques.  As Plaintiff points out, however, and as evidenced by the F&CS treatment records, Plaintiff saw Dr. Drummond at least eight times over a treatment period of eighteen months. [R. 129, 139, 144, 149, 151,  249, 261, 266].   Dr. Drummond oversaw and signed Plaintiff's treatment plan, adjusted medication and authorized medication refills. [R. 133-137, 240, 246-247, 249, 265, 268, 271].   Furthermore, Dr. Drummond was a member of the treatment team at F&CS, which included counselors, therapists, case managers and another psychiatrist, Vanessa Werlla, M.D.  The ALJ mentioned the F&CS records [R. 20]  but, other than noting the multiple missed appointments, he did not explain how he

10

considered or weighed the evidence from F&CS or whether those treatment records served as support or contradictory evidence for Dr. Drummond's assessment of Plaintiff's ability to perform work-related activity. The ALJ's conclusion that Dr. Drummond saw Plaintiff for only 5 to 10 minutes is, therefore, contrary to the evidence in the record and his rejection of Dr. Drummond's assessment on this basis was error.

Counsel for the Commissioner argues that the ALJ properly rejected Dr. Drummond's findings because, other than restricted affect and depressed mood, the treatment records did not contain abnormalities or work-related deficiencies. The Commissioner also contends that Dr. Drummond provided no explanation for her assessment and her findings "were contradicted by the findings of [Dr. Gordon]." [Dkt. 20, pp. 5-6]. None of these reasons for rejecting Dr. Drummond's opinion were stated by the ALJ in his decision. The Court may not create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the decision itself. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir.2004) ("That the record contains evidence that may support a specific factual finding cannot substitute for the finding itself."); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir.2001) ( "[W]e are not in a position to draw factual conclusions on behalf of the ALJ.") (internal quotation marks omitted).

Counsel for the Commissioner also argues that the ALJ weighed Dr. Gordon's opinion against Dr. Drummond's opinion and found Dr. Gordon provided a "more in-depth and complete picture of Plaintiff's mental status and ability to function in the workplace." [Dkt. 20, p. 6]. The ALJ did state that weight was given to Dr. Gordon's opinion [because] he "thoroughly evaluated the claimant." [R. 21]. The Court is not

persuaded, however, that this cursory explanation provides a legally sufficient or factually supported reason for rejecting Dr. Drummond's opinion. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (citing *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) ("[A] minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position."). That the ALJ did not provide an analysis of any perceived discrepancies between the two opinions is especially problematic in this case because Dr. Gordon's opinion was based upon a mis-reading of the medical record when he concluded Plaintiff had malingered. [R. 188, 277].

Dr. Werlla, one of the psychiatrists at F&CS, headed Plaintiff's treatment team from March 10, 2003 to December 16, 2004, when Plaintiff's care was transferred to the "north location" and Dr. Drummond. [R. 152].   The report that Plaintiff had used THC on the weekend was recorded on April 1, 2004. [R. 188].   Dr. Gordon thought the notation was dated April 1, 2006. [R. 275].   Based upon this interpretation of Plaintiff's treatment record, Dr. Gordon diagnosed Plaintiff with malingering and cannabis abuse under Axis I.[5] [R. 277].

With regard to the Commissioner's argument that the ALJ properly chose Dr. Gordon's "more in-depth" opinion over Dr. Drummond's opinion, the Court notes that

---

[5]   Because mental disorders are often characterized by impairments in several areas, diagnosis requires a multiaxial evaluation. Axis I refers to the individual's primary clinical disorders that will be the foci of treatment; Axis II refers to personality or developmental disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to the clinician's assessment of an individual's level of functioning, often by using a Global Assessment of Functioning rating (GAF), which does not include physical limitations. *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed.1994), pp. 25-32.

the ALJ included bipolar disorder as a severe impairment at step two.[6]  This finding is contrary to Dr. Gordon's statement that he could not substantiate the diagnosis of bipolar disorder.  It appears, therefore, that the ALJ did not rely exclusively upon Dr. Gordon's opinion but credited, to some extent, the clinical findings by the F&CS treatment team for his conclusion.  However, because the ALJ did not explain how the evidence from F&CS was weighed or how it factored into his determination, the Court cannot assess the merits of his decision. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (unless ALJ explicitly weighs all the significantly probative evidence, reviewing court cannot find his decision is supported by substantial evidence).

In his decision, the ALJ relied heavily on Dr. Gordon's report for his credibility determination.  He found Plaintiff "was not honest with the examiners regarding her drug use." [R. 20].  Though the ALJ did not include any reference to either an April 1, 2004 or April 1, 2006 treatment note attributable to Dr. Werlla in his summary of the medical evidence, he specifically cited Dr. Gordon's opinion that Plaintiff appeared to have problems with ongoing cannabis abuse if not polysubstance abuse and was malingering. [R. 20].  Because Dr. Gordon's findings were based upon a faulty reading of the treatment record, his opinion regarding Plaintiff's ability to perform work activities was not consistent with the medical evidence and was not entitled to more weight than the opinion of Dr. Drummond.  The ALJ's reliance upon Dr. Gordon's opinion for his credibility determination, therefore, was error.

---

[6]   The ALJ cited Exhibit 3F as the basis for this finding. [R. 17].  The 114 pages that make up Exhibit 3F are F&CS treatment records. [R. 127-241].

Finally, the Court notes that Plaintiff's ability to attend school and obtain an associate degree may be considered by the Commissioner in determining whether a claimant is entitled to disability benefits. *See Gay v. Sullivan*, 986 F.2d 1336, 1339 (10th Cir. 1993); *Markham v. Califano*, 601 F.2d 533, 534 (10th Cir. 1979) (school attendance, like other activities, may be considered as one factor in the spectrum of evidence to be evaluated).   However, in this case, the only evidence in the record regarding Plaintiff's completion of a legal assistant degree program is in the F&CS treatment records and Plaintiff's testimony at the hearing that she studied law for 18 months at Metropolitan College, which she said "wasn't a good college." [R. 299-300].   For the ALJ to rely upon Plaintiff's attendance at school as evidence of her ability to perform substantial gainful activities, he should develop the record regarding the functional requirements of Plaintiff's legal studies, i.e., ability to attend regular classes, concentrate and complete assignments, etc., and explain how those functions translate to a work setting.

## Conclusion

After review of the record, the Court concludes the ALJ failed to demonstrate that he had properly considered the medical evidence in determining the weight to be accorded the opinion of Plaintiff's treating physician and in his credibility evaluation. The decision of the Commissioner finding Plaintiff not disabled is, therefore, REVERSED and REMANDED to the Commissioner for reconsideration.

Dated this 8th day of January, 2010.

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE

14